**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JAMES BATTERSON, <br>     Plaintiff, <br> vs. <br> BRUCE BANNISTER, *et al.*, <br>     Defendants. | 3:07-CV-0142-BES (VPC) <br><br> **REPORT AND RECOMMENDATION** <br> **OF U.S. MAGISTRATE JUDGE** <br><br> July 7, 2008 |

This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is defendants' motion for summary judgment (#35). Plaintiff opposed (#39) and defendants replied (#40). The court has thoroughly reviewed the record and the motions and recommends that defendants' motion for summary judgment (#35) be denied.

## I. HISTORY & PROCEDURAL BACKGROUND

Plaintiff James Batterson ("plaintiff"), a *pro se* prisoner, is currently incarcerated in the custody of the Nevada Department of Corrections ("NDOC") at Ely State Prison ("ESP") (#4). Plaintiff brings his complaint pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment right against cruel and unusual punishment. *Id*. Plaintiff names as defendants Bruce Bannister, NDOC Medical Director; Joseph Brackbill, ESP Director of Nursing Services; Ted D'Amico, former NDOC Medical Director; Boja Lemich, former ESP Nurse; and John Doe 1. *Id*.

Plaintiff alleges that while in NDOC custody, he developed a spinal condition called "kyphosis" as a result of a compression fracture he suffered just prior to his incarceration. *Id*. Kyphosis causes plaintiff's back to "restructure," which plaintiff describes as developing a "hump" in his back, and causes him chronic pain, muscle spasms, loss of sleep, and a lack of concentration to his daily routine. *Id*. Plaintiff further alleges that defendants provided him with

only two 400 mg Advil tablets per day for the pain, and claims that he has received no treatment at all since July 2006. *Id*. Plaintiff claims that all named defendants have told him that NDOC does not treat chronic pain and/or old injuries. *Id*.

Specifically, in count I plaintiff alleges that defendants Bannister and Brackbill have refused plaintiff adequate medical care by denying plaintiff's grievances and stating that NDOC did not treat chronic pain or old injuries. *Id*. at 4. In count II, plaintiff make the same allegations as to defendants D'Amico and Lemich. *Id*. at 5. Additionally, plaintiff alleges that although defendant Lemich stated that she would put plaintiff on a list to see a specialist, she failed to do so. *Id*. In count III, plaintiff alleges that Defendant John Doe twice denied his second level grievances requesting medical care for his kyphosis. *Id*. at 6.

The Court notes that the plaintiff is proceeding *pro se*. "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II. DISCUSSION & ANALYSIS

### A. Discussion

#### 1. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 126 S.Ct. 2572, 2576 (2006). Where reasonable minds could differ on the material facts at issue, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

**B. Analysis**

As plaintiff's three counts are based on very similar facts and theories, the court addresses all three counts together. Generally, defendants argue that plaintiff's claims are founded on his incorrect belief that NDOC no longer treats chronic pain (#35, p. 11). Defendants contend that the enforcement of NDOC's pain medication policy does not violate the Eighth Amendment because inmates are not unilaterally denied pain medication; instead, each inmate's condition is reviewed on a case-by-case basis. *Id*. at 12. Defendants argue that this policy is based on "sound medical practices" and a standard of care which recognizes that long-term use of pain medication can cause other serious and life-threatening diseases. *Id*.

**1. Evidence**

The court has reviewed the parties' evidence and summarizes it here. Plaintiff testified during his deposition that he first injured his back in 2000, prior to his incarceration, when he rolled his truck while he was four-wheeling in Colorado (#37, Ex. A, p. 5). He testified that after the accident, he "was like drunk for two weeks because it hurt so bad," and that he did not seek medical care until 2001 or 2002 when he was incarcerated at Indian Springs. *Id*. at 6-7. After taking a chest x-ray for a sinus infection, a physician discovered that plaintiff had a "mid-thoracic

3

compression fracture of the spine." *Id*. at 7. Plaintiff testified that this physician counseled him that surgery could possibly worsen his condition, that narcotics were addicting, that plaintiff should try to live with it the best he could, but that he should submit a kite if the pain got too intense. *Id*. at 8. Plaintiff also testified that although the pain is getting worse, he does not want narcotics and instead would like to be treated with non-narcotic pain medications. *Id*. at 9.

Plaintiff's medical records confirm that on April 12, 2002, plaintiff received a chest x-ray which indicated evidence of a prior trauma of a mid-thoracic compression fracture (#37, Ex. C). On September 16, 2002, plaintiff requested treatment because he had "a compression fracture on the spine and its bothering me very bad at times." *Id*., Ex. E. Plaintiff was examined by a member of the nursing staff and was prescribed three days of Parafon Forte, a muscle relaxer. *Id*., Ex. F. On September 22, 2002, plaintiff again complained of pain and the nursing staff prescribed Motrin.[1] *Id*. A member of the nursing staff examined plaintiff on September 23, 2002, and although the nurse noted that plaintiff did not seem to have a problem waking or sitting and that he had no acute distress, the nurse prescribed plaintiff more Motrin and scheduled him for the next available appointment with the physician.[2] *Id*. On September 26, 2002, Dr. Gedney examined plaintiff, concluded that plaintiff had "intermittent muscle spasms" in his upper back, prescribed more Parafon Forte, and advised plaintiff on exercising and stretching. *Id*. at Ex. G. On October 28, 2002, plaintiff received more Parafon Forte, as well as Naprosyn, an anti-inflammatory. *Id*. An NDOC physician again renewed plaintiff's Parafon Forte prescription on January 17, 2003, when plaintiff was examined for a rash. *Id*., Ex. H. On July 21, 2003, plaintiff sent a medical kite requesting more medication, and the kite indicates that medical saw plaintiff shortly thereafter. *Id*., Ex. I.

---

[1] Defendant Bannister notes in his affidavit that plaintiff's medical chart indicates that on September 22, 2002, plaintiff complained of "lower back" pain from a previous injury (#35, Affidavit of Bannister, ¶ 5). Defendant Bannister states that this is inconsistent with the site of the compression fracture in his upper back and neck. *Id*.

[2] The September 23, 2002 chart entry also states that plaintiff "became angry and left," after stating that he would have his mother call the NDOC Director so that he could be seen by a physician immediately (#37, Ex. F).

4

In 2004, then NDOC Medical Director defendant D'Amico revised NDOC's pain medication policy. A June 29, 2004 memorandum to all ESP inmates from defendant Brackbill states:

> Effective beginning July 5, 2004, per Dr. D'Amico Medical Director, we will no longer treat long-term chronic pain on a routine basis. Pain will be treated only on an acute, short-term basis. This means, if you have an [sic] recent injury, dental extraction or an incident of pain requiring some pain intervention, you will be treated for a period of 3-4 days average, but not more than 10 days. Short-term treatment, 3-4 days, will be KOP'd to you. Treatment of 5 to 10 days will be placed on pill-call. If you refuse to take your pill-call meds for more than 3 doses, this medication will be discontinued.
>
> No long-term treatment will be available, unless doctor deems such treatment necessary. This type of treatment will be assessed on an individual basis and may require admission to the infirmary for this type of treatment. <u>Long term use of medications for pain can result in severe stomach damage, which far outweights [sic] the risk to one's health compared to dealing with daily aches and pain.</u>

*Id.*, Ex. J (emphasis in original). A second memorandum from defendant Brackbill on July 1, 2004 reiterated that defendant D'Amico had changed the policy such that "no long term pain management will be provided on an on-going basis." *Id.*, Ex. K. To justify the new policy, defendant Brackbill cited chronic stomach disorders and stomach bleeding, as well as inmates' practice of using medications as a tool of trading and purchasing goods within the prison system.[3]

---

[3] The July 1, 2004 memorandum states in full: "As previously stated, no long-term pain management will be provided on an on-going basis. <u>*This is per Dr. Ted D'Amico, Medical Director, NDOC*</u>. The reasons for this are as follows:

1. Long-term use of pain medications, such as, Motrin, Indocin, Naproxyen, and others, can result in chronic stomach disorder and stomach bleeding. Treatment of short-term pain will still be available for injury, acute pain and discomfort. However, this will be available only for a period <u>not to exceed 14 days</u>. Pain meds ordered for 3-4 days will be KOP'd. Meds ordered for more than 4 days will be placed on pill-call. Refusal of more than 3 doses ordered will result in the medication being discontinued.

<u>IF YOU FEEL YOU NEED MEDICATIONS FOR YOUR PAIN OUTSIDE THESE GUIDELINES, MOTRIN IS AVAILABLE FOR PURCHASE IN THE INMATE STORE</u>.

2. This issue is also related to the chronic practice of using the above medication as a tool of trading and purchasing goods and services among the inmate population. While all know this practice is against regulations, it was an active behavior in all institutions (#37, Ex. K) (all emphasis in original).

5

1  *Id*.

2  On January 13, 2005, plaintiff sent a medical kite stating that he had a compression fracture for which he needed pain medication, but that every time he requested medication, he was told "carson city says no medication." *Id*., Ex. L.  Dr. Steven MacArthur, former ESP physician, responded that plaintiff could make an appointment with him if he wanted, but "there will be no chronic pain med." *Id*. (emphasis in original).

7  Plaintiff filed an informal grievance on January 24, 2006 complaining that he had submitted numerous medical kites that were unanswered (#39, Ex. G, grievance log number 2006-24-1321).  Plaintiff's caseworker told plaintiff to resubmit his medical kite specifically requesting an appointment to see the doctor, but also stated "no long-term pain management will be provided on an on-going basis." *Id*.  Plaintiff filed a first-level grievance on February 7, 2006, to which his caseworker noted that plaintiff had been seen by medical staff on February 8, 2006. *Id*.  On February 19, 2006, plaintiff appealed to the second level, and defendant D'Amico responded that "APN B. Lemich has all abilities and authority to diagnose and treat, under the direction of Dr. D'Amico as the Medical Director.  She is correct, as NDOC does not treat chronic pain or old injuries." *Id*.  He then stated that plaintiff should request another appointment with the doctor and that if long-term treatment with pain medication was warranted, a special request could be made.[4]  *Id*.

19  Meanwhile, on February 11, 2006, plaintiff wrote a medical kite asking for advice about how to make his back injury feel better "since Joe Brackbill is enforcing Ted D'Amico [sic] restriction without giving me any kind of treatment for my compression fracture...." *See* #37, Ex. N.  Defendant Lemich responded that plaintiff should limit activities to avoid pain, eat a diet with calcium, get lots of sunlight, and exercise daily to build muscle. *Id*.  On February 22, 2006,

---

[4] Although defendant D'Amico's name appears on grievance log number 2006-24-1321 as the second level responding individual, defendant Bannister actually signed the grievance (#39, Ex. H). Defendant D'Amico explains that he dictated the grievance response to his secretary, but before he could sign the grievance, he went on family sick leave and then ultimately retired from NDOC (#39, Ex. M). Defendant Bannister signed all unsigned pending grievance responses when he replaced defendant D'Amico. *Id*. Although plaintiff implies something improper occurred, the court sees no issue here.

6

1   plaintiff wrote another medical kite stating that he had intense pain in his back. *Id.*, Ex. M.
2   Defendant Lemich responded that she had ordered spinal x-rays and a temporary pain pack, and
3   that although compression fractures will heal, the vertebrae will never be the same. *Id*. She
4   further stated that NDOC considers his back a "chronic" injury, and that "NDOC does not allow
5   me to treat chronic issues. Please purchase some IBU from the canteen." *Id*.

6   On March 7, 2006, plaintiff's back was x-rayed and a radiologist determined that plaintiff
7   has a "mild scoliotic curvature of the thoracic spine concave to the right" (#37, Ex. D). On March
8   12, 2006, plaintiff wrote to Warden McDaniel stating that he had back pain, that defendant
9   Lemich had prescribed Ibuprofen and Elavil (which he claimed he could not take due to side
10  effects), and that the 2004 pain medication policy was preventing his proper treatment (#39, Ex.
11  C). Plaintiff further stated that even though he followed the instructed protocol to receive the
12  Ibuprofen defendant Lemich had prescribed, he either did not receive it at the correct time or did
13  not receive it at all. *Id*. Defendant Brackbill, not Warden McDaniel, responded by stating "long-
14  term treatment with IBU is prohibited by policy. ... You may receive I.B.U. (PRN) as needed, but
15  you must make I [sic] request for this medication, each time." *Id*.

16  On March 19, 2006, plaintiff sent another medical kite asking when he would receive his
17  radiology results and whether he had been scheduled to see a specialist (#37, Ex. N). Defendant
18  Lemich did not respond to the question about the doctor's appointment, but stated that the results
19  would be back soon, after which she would suggest a plan of care. *Id*. Between March 26 – 28,
20  2006, plaintiff complained of back pain, received Ibuprofen, and his medical charts state that he
21  was observed ambulating without pain.[5] *Id*.

22  On May 1, 2006, defendant Lemich sent plaintiff a plan of care. *Id*. She explained that
23  plaintiff's compression fracture had caused his vertebrae to collapse on themselves, and although
24  they had all healed, the fractured vertebrae were "shorter in height" than the vertebrae which had
25  not been fractured. *Id*. Defendant Lemich further explained that as a result, plaintiff had begun

---

[5] During this time the evidence demonstrates that plaintiff, unhappy with his treatment, yelled at and was verbally abusive to the medical staff (#37, Ex. P).

7

to develop "kyphosis," which is a "hump" in his back between his shoulder blades that "can cause pain." *Id*. She noted that the pain was not a result of the fracture itself, but from the restructuring of his back through the kyphosis. *Id*. Defendant Lemich stated that she had received approval to give plaintiff two Ibuprofen per day, which she believed would help his pain, and that she was "asking for [plaintiff's] cooperation with this. I understand that your last admission into the infirmary was ugly." *Id*. Finally, she noted that because she got approval to provide plaintiff with Ibuprofen for only six months, plaintiff would have to kite medical to get a renewal. *Id*.

On August 17, 2006, plaintiff filed another grievance, which he ultimately appealed to the second level (#39, Exs. F and I). Defendant Brackbill responded to plaintiff's informal grievance by stating that long-term treatment with "NSAIDS" was not in plaintiff's best interests, but that plaintiff was free to treat himself with Ibuprofen from the canteen. *Id*. Defendant Brackbill responded to plaintiff's first-level grievance by stating that if Ibuprofen did not help plaintiff, he could request to be admitted to the infirmary for more significant treatment for his pain because "narcotics are not available to be used in the yard for treatment." *Id*., Ex. I. Defendant Bannister responded to plaintiff's second-level grievance in October 2006 by stating that he was "unable to determine from [plaintiff's] grievance the nature of your medical complain [sic]. If you have a serious medical problem, needing attention, please kite to see Medical." *Id*.

Defendant Bannister submits an affidavit discussing NDOC's chronic injury and pain medication policy, which was instituted by defendant D'Amico (#35, Affidavit of Bannister, ¶ 2). Defendant Bannister explains that the policy prohibits nursing staff from automatically prescribing or taking the initiative in extending long-term pain medication as a plan of care. *Id*. at ¶ 12. Instead, NDOC physicians are required to examine each inmate complaining of chronic pain on a case-by-case basis, after which they may prescribe long-term pain treatment plans if warranted. *Id*. This policy was implemented because "it is not good medical practice to simply extend existing treatment modalities without regard to future complications arising from prolonged medicine use." *Id*. Defendant Bannister notes that research has revealed that the long-term use of chronic pain medications can have "serious deleterious effects" on the liver, kidneys and circulatory system. *Id*. at ¶ 13. Defendant Bannister emphasizes that NDOC physicians can

8

and do treat inmates' chronic pain conditions, but that the they have ceased the prior practice of "simply providing continuing medications for chronic pain without further and on-going evaluations." *Id*. Defendant Bannister states that in many cases the best course of treatment is "conservative care with an emphasis on non-prescription medical responses such as diet and exercise." *Id*. at ¶ 12.

Defendant Bannister also reviewed plaintiff's medical records.[6] He states that a diagnosis of kyphosis does not mean that plaintiff has a specific medical condition because kyphosis is merely an angulation of the spine as seen from a side view, that the curvature is "barely noticeable," and that in his medical judgment, plaintiff is not a candidate for surgery. *Id*. at ¶ 14. Defendant Bannister affirms that the conservative approach – exercise, a diet high in calcium, sunlight, avoiding pain inducing work, and occasional Ibuprofen as necessary – is proper. *Id*. at ¶¶ 13-14. Defendant Bannister concludes that plaintiff received appropriate care under the circumstances because long-term pain medication is not in his best interests. *Id*. at ¶ 16.

In written discovery, defendant Lemich admits that although she put the plaintiff on a list to see a specialist, he never saw or was examined by a specialist (#39, Ex. L). However, she denies that defendants D'Amico, Bannister and Brackbill would not let her treat chronic pain or old injuries. *Id*.

**2. Eighth Amendment Claim**

Before the court addresses the specific elements of plaintiff's Eighth Amendment claim, it makes the preliminary observation that defendants' pain medication policy, on its face, appears to meet constitutional muster. The court agrees that it is reasonable, indeed very important, that prison physicians evaluate inmates' medical issues on a case-by-case basis, and not simply routinely renew medications that are known to potentially cause more serious problems such as stomach, liver and kidney disease in some people. Additionally, the court finds that requiring inmates to stay in the infirmary while taking narcotics is a reasonable way to prevent narcotics

---

[6] The majority of defendant Bannister's summary of plaintiff's medical records need not be set out here because the court has separately detailed the evidence above.

9

trading on the yard.

However, the court disagrees with defendants' argument that plaintiff has misinterpreted this policy to mean that NDOC has completely eliminated pain medication for chronic pain or old injuries. As the court sets out below, although defendants' policy is permissible in theory, there are issues of fact as to whether defendants have carried out this policy in violation of the Eighth Amendment.

### a. Serious Medical Need

A prison official violates the Eighth Amendment when he acts with "'deliberate indifference' to a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To establish an Eighth Amendment violation, a plaintiff's case must satisfy an objective standard – that the deprivation was serious enough to amount to cruel and unusual punishment, and a subjective standard – deliberate indifference. *Id*. at 834; *see also Wilson v. Seiter*, 501 U.S. 294, 297-304 (1991).

The objective standard, a "serious medical need," is met if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Ninth Circuit's examples of serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citations omitted); *see also Jett v. Palmer*, 439 F.3d 1091, 1096 (9th Cir. 2006).

Defendants argue that it is undisputed that plaintiff is *not* suffering from a significant spinal anomaly, and that there is "zero medical or objective data" to support plaintiff's subjective complaints of pain (#40, pp. 6, 9). This is not accurate. Plaintiff's medical records reveal that he had a mid-thoracic compression fracture and that he suffers from a "mild scoliotic curvature concave to the right" (#35, Ex.s C, D and O). Further, prior to the 2004 policy, NDOC doctors prescribed plaintiff pain medication to treat his back pain. *Id*., Ex. F, G and H. Viewing the facts in the light most favorable to plaintiff as the non-moving party, the evidence demonstrates that

1  there exists a genuine dispute of material fact as to whether plaintiff has a back injury that causes
2  plaintiff chronic and substantial pain or pain that significantly affects his daily activities. Based
3  on the evidence, the court concludes that a reasonable jury could find that plaintiff suffers from
4  a "serious medical need."[7]

### b. Deliberate indifference

6  The subjective standard of deliberate indifference requires "'more than ordinary lack of
7  due care for the prisoner's interests or safety.'" *Farmer*, 511 U.S. at 835, *quoting Whitley v.*
8  *Albers*, 475 U.S. 312, 319 (1986). The requisite state of mind lies "somewhere between the poles
9  of negligence at one end and purpose or knowledge at the other." *Id.* at 836. It is the equivalent
10 of recklessly disregarding a substantial risk of serious harm to the inmate. *Id.* Mere negligence
11 on the part of prison medical staff is not sufficient to prove deliberate indifference. *Hutchinson*
12 *v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Prison officials are deliberately indifferent
13 when they "deny, delay, or intentionally interfere with medical treatment" of a prisoner's serious
14 medical need. *Id.* However, prison medical staff do not violate the Eighth Amendment simply
15 because their opinion concerning medical treatment conflicts with the opinion of the inmate-
16 patient. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

17 Defendants contend that plaintiff's medical records document NDOC's continuing
18 medical care, and that merely because defendants did not provide plaintiff with medication upon

---

[7] Defendants argue that plaintiff incorrectly came to the conclusion that he has "extensive spinal damage" as a result of defendant nurse Lemich's interpretation of his x-ray, and that no physician has made this conclusion (#40, pp. 3-4). Defendants note that plaintiff has not attempted to qualify defendant Lemich "as having the expertise to accurately interpret an x-ray" or to demonstrate that defendant Lemich is familiar "with spinal anomalies or what does or does not constitute the norm for disc space measurements." *Id.* By these statements, the court understands defendants to imply that defendant Lemich does not have the requisite qualifications to have treated plaintiff for his back injury. However, throughout their papers, defendants urge this court to accept defendant Lemich's treatment plan of additional sunlight, a high calcium diet, daily exercise and occasional use of Ibuprofen. Defendants cannot have it both ways – they cannot argue that defendant Lemich is not qualified to treat plaintiff but then argue that defendant Lemich's treatment plan is sufficient medical care.
Interestingly, defendants accuse plaintiff of the very same "cherry picking" strategy with respect to defendant Lemich's role in his treatment, and claim that it destroys plaintiff's credibility (#40, p. 3 (defendants argue that "nurse Lemich's opinions are acceptable when they fit within the framework of what [plaintiff] desires (i.e., medication) but are deemed 'absurd' when they run counter to [plaintiff's] unsupported conclusions regarding medical treatment.")).

11

plaintiff's demand does not mean that defendants denied plaintiff adequate medical care (#35, p. 11). Further, defendants argue that they could have easily over-medicated plaintiff without concern for his future health, but that they instead tailored a particular plan of care of exercise, diet, and medications when appropriate. *Id*.

The court concludes that genuine issues of material fact exist as to whether defendants acted with deliberate indifference. Defendants' primary argument centers on the fact that NDOC does indeed treat chronic pain and old injuries, but that the 2004 pain medication policy requires an individual, case-by-case review. In fact, defendants argue, "seeking to protect [plaintiff] from the life-threatening effects of continued use of pain medications is not indifference, it is the exact opposite" (#40 , p. 5). However, there is no indication that a physician with the ability to treat plaintiff with pain medication has ever made a determination that it is specifically in *plaintiff's* best interests not to receive long-term treatments with pain medication and/or anti-inflammatories. Further, no where in plaintiff's medical records is there evidence that such medications have a deleterious effect on *plaintiff's* stomach, liver, kidneys or circulatory system. Instead of instituting their policy by individually examining whether such medications would affect plaintiff, it appears that defendants simply stopped giving him the medication based on the fact that a study exists which states that such medications "*can*" cause stomach, kidney and liver problems.[8] A reasonable jury could either view defendants' justifications as defendants protecting plaintiff by denying him pain medications, or as defendants hiding behind the "life-threatening" mantra in order to deny plaintiff expensive medical care.

Moreover, neither defendant Lemich, a nurse practitioner, nor defendant Brackbill, a nurse, was able to prescribe pain medication pursuant to defendant Bannister's description of the 2004 policy. This is clearly evidenced by their responses to plaintiff's grievances. Indeed, in

---

[8] Indeed, the evidence reveals that plaintiff took such medications prior to 2004 without incident. Of course, the court understands that some side effects as a result of taking pain medications over a long period of time will not be evident merely from symptoms, and that blood or other tests would be necessary to demonstrate that an issue exists. The court also understands that defendants' pain medication policy is a good one, and agrees that inmates should be given individual care. The point is that defendants cannot justify their policy based on that fact that an individualized inquiry is required to protect health, and then fail to make that individualized inquiry.

12

1   contradiction of defendant Bannister's affidavit, which states that NDOC treats chronic pain on
2   a case-by-case basis, some of the defendants' responses indicate that NDOC fails *in practice* to
3   treat any chronic pain conditions.[9]

4   Defendants argue that plaintiff was examined by physicians in 2002 and 2006. However,
5   these physicians were radiologists – although they took and read plaintiff's x-rays, it does not
6   appear that either physician was in a position to prescribe medication or to make a determination
7   that pain medication would do more harm than good. The records before the court indicate that
8   plaintiff has not been examined since 2003 by an NDOC doctor, who, according to NDOC's
9   policy, is the only individual who could actually *treat* the injuries that the radiologists identified.
10  Although defendant Bannister studied plaintiff's medical records, there is no indication he has
11  ever examined or met with the plaintiff.[10]

12  Defendants also take issue with the fact that plaintiff did not check on his prison intake
13  form that he had a pre-existing back injury, arguing that this is evidence that plaintiff does not

---

[9] *See* # 37, Ex. M (Lemich states "NDOC does not allow me to treat chronic issues"); *see also* # 39, Ex. C (Brackbill states "long-term treatment with I.B.U is prohibited by policy"); *see also* #39, Ex. H, informal grievance response (Oxborrow states "no long-term pain management will be provided on an ongoing basis"); *see also* #39, Ex. H, second-level grievance response (D'Amico states "NDOC does not treat chronic pain or old injuries"). Even Dr. MacArthur – who should have been able to treat plaintiff's pain if so warranted according to the 2004 policy – stated *prior to* examining plaintiff that he would examine plaintiff, but that he would not provide him with pain medication (#37, Ex. L) ("You can see me if you want but there will be no chronic pain med.").
However, the court does note that some of defendants' responses state that NDOC treats chronic pain on an individual basis. *See* #35, Affidavit of Bannister; *see also* #39, Ex. H, second-level grievance response (D'Amico states "If long-term meds are warranted a special request for meds can be submitted.").

[10] As mentioned above, defendant Bannister responded to plaintiff's second-level grievance filed on September 18, 2006 by stating that he was not able to determine the nature of plaintiff's complaint from plaintiff's grievance, and told plaintiff that he should simply kite medical if he needed medical care (#39, Exs. F and I). The court carefully reviewed plaintiff's second level grievance. It consists of seven full pages detailing the fact that medical would not respond to his kites, the history of his injury and treatment as well as the lack thereof, defendant Lemich's diagnosis of "kyphosis," and his issue with the 2004 pain medication policy as applied to him. *Id.*, Ex. F. His grievance concludes by requesting "to have my back treated." *Id.* There is no question from plaintiff's extremely articulate and detailed grievance what the "nature of his medical complaint" is. The fact that defendant Bannister responded in such a fashion is evidence to the court of bad faith on NDOC's part with respect to the 2004 pain medication policy as applied to inmates with chronic pain.

13

have anything wrong with his back.[11]  This is irrelevant to whether plaintiff is actually suffering from pain eight years later or whether defendants have an obligation to treat plaintiff's *current* condition.  Defendants cite no Eighth Amendment case law that states prison officials are exempt from treating medical conditions that prisoners may have suffered from prior to incarceration that have remained the same, worsened, or led to other conditions while the prisoner is incarcerated.  Finally, defendants argue that there is no evidence that plaintiff is a surgery candidate (#35, p. 11).  Plaintiff has not requested surgery, nor has he argued that he is being denied surgery; thus, this is irrelevant.

Viewing the evidence in the light most favorable to the plaintiff, the court concludes that there exist genuine issues of material fact as to whether defendants acted with deliberate indifference with respect to treating plaintiff's back pain.

### 3. Qualified Immunity

Finally, defendants argue that they are entitled to qualified immunity because there has been no violation of plaintiff's constitutional rights (#35, p. 12).  A qualified immunity analysis begins with a threshold question of whether, based upon facts taken in the light most favorable to the party asserting the injury and in light of such clearly established law, an official's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If no constitutional right was violated, the court need not inquire further.  *Id*.  However, if a constitutional violation occurred, the court's second inquiry is whether the official could nevertheless have reasonably, but mistakenly, believed that his or her conduct did not violate a clearly established constitutional right.  *Id*.

Plaintiff's right to proper medical care has been "clearly established" for many years.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  However, issues of fact exist as to whether defendants violated plaintiff's Eighth Amendment rights and whether defendants acted

---

[11] Defendants take also take a conflicting opinion regarding how plaintiff originally injured himself.  Defendants stated in their motion for summary judgment that it is undisputed that plaintiff "sustained a compression fracture of his spine in an automobile accident prior to being incarcerated at ESP in 2001" (#34, p. 6).  Yet, in their reply, defendants question their own "undisputed" fact by arguing that plaintiff failed to offer evidence that he injured his back in the roll-over accident.

reasonably, but mistakenly, in their belief that their conduct did not violate plaintiff's rights. As such, the court denies defendants' request for qualified immunity.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that:

1. There exist genuine issues of material fact as to whether plaintiff is suffering from a "serious medical need;"

2. There exist genuine issues of material fact as to whether defendants acted with deliberate indifference to plaintiff's medical needs; and

3. Such issues of fact preclude granting defendants qualified immunity.

As such, the court recommends that defendants' motion for summary judgment (#35) be **DENIED**.

The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

### IV. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#35) be **DENIED**.

**DATED:** July 7, 2008.

_____
**UNITED STATES MAGISTRATE JUDGE**